IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DONALD S. ANDREWS, JR.                                                                          PLAINTIFF

V.                              Case No. 4:24-CV-00455-JM-BBM

WELL PATH, *et al.*                                                                                   DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge James M. Moody Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Moody may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

**I.     INTRODUCTION**

On May 23, 2024, Plaintiff Donald S. Andrews, Jr. ("Andrews"), filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983 while he was an inmate incarcerated in the Tucker Unit of the Arkansas Division of Correction ("ADC").[1] (Doc 2). Andrews alleges that he received inadequate medical care while in prison, which resulted in permanent neurological damage. *Id*. at 5–18. Before Andrews may proceed with this action, the

---

[1] On June 4, 2024, Andrews filed a Notice of Change of Address and provided the Court with a residential address. (Doc. 3).

Court must screen his claims in accordance with the Prison Litigation Reform Act ("PLRA").[2] 28 U.S.C. § 1915A(a).

## II.   ALLEGATIONS

Andrews sues the following Defendants in both their personal and official capacities: Rory Griffith ("Griffith), Warden Faust ("Faust), Warden DeAngelo Earl ("Earl"), Ramsey, Dr. Daniels, Dr. Vol, Dr. Foster, Dr. Beck, Dr. Smith, Dr. Lemon, Cowell, Jason M. Kelley ("Jason Kelley"), Sheila Armstrong ("Armstrong"), Pierce, McCoy, Smarjessee, and Delaney. (Doc. 2 at 19–21). Andrews sues the remaining Defendants in their official capacities only: Well Path, Corrective Care Solutions, Wendy Kelley, Dexter Payne ("Payne"), Warden Musselwhite ("Musselwhite"), Warden Moses Jackson ("Jackson"), Warden Page ("Page"), and Warden Hurst ("Hurst"). *Id*. at 19–20.

According to Andrews, he was sentenced to incarceration in the ADC on April 13, 2017. (Doc. 2 at 5). On April 20, 2017, Andrews was seen by non-Defendant Dr. Roberto Saez, who performed a physical examination and reviewed Andrews's medical records. *Id*. Dr. Saez then sent an urgent request to the ADC from the Benton County Detention Center where Andrews was being held. *Id*. Dr. Saez requested that Andrews either be transferred to state custody for medical treatment or that Dr. Saez be allowed "to get

---

[2] The PLRA requires federal courts to screen prisoner complaints seeking relief against a governmental entity, officer, or employee. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or a portion thereof if the prisoner has raised claims that: (a) are legally frivolous or malicious; (b) fail to state a claim upon which relief may be granted; or (c) seek monetary relief from a defendant who is immune from such relief. *Id*. § 1915A(b). When making this determination, the Court must accept the truth of the factual allegations contained in the complaint, and it may consider the documents attached to the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

surgery performed…due to the serious nature and risk of permanent injury to [Andrews's] neurological condition." *Id*. The ADC deferred a decision. *Id*.

On May 20, 2017, Dr. Saez made a second request to the ADC due to Andrews's worsening condition. (Doc. 2 at 5). Dr. Saez's requests were based on additional examinations, which showed acute atrophy from reports created by non-Defendant Dr. George Dimmel, an orthopedic surgeon. *Id*. Dr. Saez requested that Andrews have surgery immediately, but ADC once again deferred a decision. *Id*.

On June 10, 2017, Andrews wrote to Wendy Kelley, Director of the ADC. (Doc. 2 at 6). Andrews begged to be transferred due to his medical needs, which included "excruciating pain, no medical help, and hostile conditions." *Id*. On August 24, 2017, Andrews arrived for diagnostics at the ADC's Ouachita River Unit, the main unit/hospital for the ADC. *Id*. He received medical and psychological evaluations, which would determine his unit assignment. *Id*.

On August 28, 2017, the medical, dental, and psychological process began, although the medical staff had no record of Andrews's medical needs. (Doc. 2 at 6). The only note made by a staff nurse indicated that Andrews "had foot drop" and was on high doses of Gabapentin. *Id*. Andrews was told to inform his parent unit about his medical conditions and was given a bottom bunk only script. *Id*.

On August 30, 2017, Andrews was transferred to ADC's Grimes Unit. (Doc. 2 at 6). All of his medications were stopped, and he was in excruciating pain. *Id*. On September 5, 2017, he submitted a medical request and an emergency grievance for medical attention. *Id*.

On September 6, 2017, Andrews was interviewed by a nurse, and he told the nurse about his numerous medical problems. (Doc. 2 at 6). The nurse referred him to the provider, non-Defendant nurse Simmons. *Id*. at 6–7. On September 10, 2017, Simmons examined Andrews and found that he suffered from severe atrophy in his right calf muscle, foot drop of the right foot, numerous scars, broken bones, and surgeries. *Id*. at 7. Andrews had severe neuropathy in his right leg and foot. *Id*. He was issued a cane and scripts that limited his work and activity, including no stairs and bottom floor only, and he was given mild drugs. *Id*. Andrews signed medical releases, which would later show a spiral fracture. *Id*.

On October 1, 2017, the Grimes Unit received medical records from non-Defendants Dr. Dimmel and Dr. Norman Tubb. (Doc. 2 at 7). Simmons then decided to order footwear and have Andrews seen by a neurologist orthopedic doctor. *Id*. On October 15, 2017, Andrews was examined by non-Defendant Dr. Stephen Shafizadah at St. Vincent's Orthopedic Clinic. *Id*. Dr. Shafizadah's examination revealed that Andrews had at least three compression fractures, severe spinal stenosis, and various other major neurological and spinal disorders that required immediate surgery before they became irreversible, "if it wasn't already too late." *Id*.

In late January or early February of 2018, Andrews was scheduled for surgery and transported to St. Vincent's Hospital "after a lengthy wait for approval by ADC." (Doc. 2 at 8). Andrews claims that, due to "the complexity of the surgery and the general deterioration of [his] condition since so much time had been allowed to pass and let the condition worsen…[Andrews] died twice during the extensive surgery[.]" *Id*.

4

In February 2018, Andrews was transferred to the Ouachita River Unit, where he would be housed during his period of recovery based on the long-term special needs that he would require, such as physical therapy and hospitalization. (Doc. 2 at 8). In late February or early March 2018, Andrews was taken back to the clinic at St. Vincent's to have the staples from the incision removed and for a checkup of his spine. *Id*. Dr. Shafizadah ordered Andrews to undergo daily treatment on a spine stimulator, which had to be approved. *Id*. When it was approved, Andrews was back at Ouachita River Unit with a new spine stimulator that was kept locked in the day clinic where he would use it. *Id*.

On March 18 or 19, 2018, Andrews was using the bathroom. (Doc. 2 at 8). The lights were dim; the bathroom was flooded; and Andrews slipped and fell on the bathroom floor. (Doc. 2 at 8). He was in agonizing pain. *Id*. Andrews had x-rays taken and was told that it was just a little arthritis and nothing to worry about. *Id*. at 8–9. Andrews was given a shot of pain medication and returned to the barracks in a wheelchair. *Id*. at 9.

The next day, Andrews awoke in excruciating pain. (Doc. 2 at 9). He told the pill call nurse that something was wrong with his back, and it was more than arthritis. *Id*. Andrews put in sick calls and grievances, but nothing was done. *Id*. Over the next two months, Andrews filed grievances about medication and pain. *Id*. His medication was decreased, and he was charged for medical services. *Id*.

On June 20, 2018, Andrews was taken back to Dr. Shafizadah, who told Andrews that he had broken his back when he fell. (Doc. 2 at 9). That day, Andrews wrote a letter

to Wendy Kelly, Rory Griffith, the ADC Medical Director, and Warden Faust. *Id*. He included copies of requests and grievances where he had asked staff to correct the medical problems that he was having at the Ouachita River Unit, such as not receiving help or treatment. *Id*. Andrews informed the staff of his fall, the flooded floor, filthy conditions, and medical neglect and maltreatment. *Id*.

On June 29, 2018, Andrews received a letter from non-Defendant Jada Lawrence, Executive Assistant to the ADC Director, acknowledging receipt of Andrews's correspondence and stating that they forwarded a copy to Griffith. (Doc. 2 at 10). However, nothing was done about the issues that Andrews brought to their attention. *Id*.

Andrews filed numerous grievances about his extreme back pain and asked for time with the spinal stimulator. (Doc. 2 at 10). When Andrews was told that it was his responsibility to show up for treatment, he told staff that he could not let himself out of housing or unlock the day clinic's door on the weekends. *Id*. Andrews claims that the staff showed animosity towards him and retaliated against him. *Id*.

On July 11, 2018, Andrews filed a grievance concerning his use of the spinal stimulator. (Doc. 2 at 10). He argued that the day clinic was not open on weekends; therefore, he did not have access to the spinal stimulator on weekends, and "treatment call is not called out regularly" due to fights, suicides, drug overdoses, and staff shortages. *Id*. He claims that administration and Pierce blamed Andrews. *Id*.

On July 23, 2018, Andrews was losing control of his bowel movements, losing feeling in his lower extremities, and losing the ability to walk. (Doc. 2 at 10–11). Delaney told Andrews that he could not file an emergency grievance. *Id*. at 10. Delaney changed

the grievance from an emergency grievance to an informal resolution after Andrews repeatedly tried to request help through medical requests, sick calls, and the officer in charge of his barracks. *Id*. at 11.

On August 1, 2018, non-Defendant Dr. Vowel reviewed Andrews's medication list and determined that twice daily hydrocodone was sufficient. (Doc. 2 at 11). Andrews asked if there was anything other than hydrocodone because it contained Tylenol, which is not good for his liver because he has Hepatitis C. *Id*. Out of retaliation, Dr. Vowel stopped all hydrocodone and did not replace it with any substituted pain reliever. *Id*. Dr. Vowel deliberately left Andrews in pain. *Id*.

On August 18, 2018, Andrews saw Smarjessee, Physician Assistant, and was told that his pain medication would be restored. (Doc. 2 at 11). However, because Andrews had been writing grievances, nothing was done to help him with pain or to treat any issues with his back or with the stimulator. *Id*.

On September 5, 2018, Andrews wrote a grievance about Pierce and Smarjessee, and non-Defendant Dr. Vowel, for failing to provide medical help. (Doc. 2 at 11). He requested to see the neurosurgeon or orthopedic doctor. *Id*.

On October 1, 2018, Andrews was again examined by Dr. Shafizadah, who concluded that Andrews's foot drop and the paralysis in his right foot and calf were permanent. (Doc. 2 at 12). For over a year, medical staff had been given multiple doctors' opinions, records, and pleas to help Andrews, but the delays in treatment resulted in permanent neurological damage. *Id*.

On October 5, 2018, Andrews and Dr. Daniels discussed treatment and medication options. (Doc. 2 at 12). Andrews was placed on twice daily hydrocodone for pain and a series of muscle relaxers. *Id*. He was told that they would look into "options of cement in spine," and, until then, the spinal stimulation would continue. *Id*. Andrews was not given any pain medication. *Id*.

On November 1, 2018, Andrews went to the day clinic for a spinal treatment with the stimulator. (Doc. 2 at 12). When he received the stimulator from Pierce, it was inoperable because the belt was broken. *Id*. From November 2, 2018, through November 26, 2018, Andrews made numerous requests to have the belt fixed because the stimulator was all that was being done to try to heal his back. *Id*. Andrews was told to go back to the barracks without treatment for three weeks. *Id*. On November 27, 2018, Andrews filed a grievance about the broken stimulator and claimed that his back was broken and medical staff was not doing anything about his back or to fix the stimulator. *Id*. at 13.

On January 31, 2019, Jason Kelly and Dr. Daniel called Andrews to the day clinic. (Doc. 2 at 13). They explained the company that manufactured the stimulator suggested Andrews no longer use the belt. *Id*. Jason Kelly told Andrews he was unsure how to write this up and asked Andrews what would work. *Id*. Andrews said he just wanted his back fixed and to be pain free. *Id*. Jason Kelly and Dr. Daniel told Andrews that they would sign the waiver and get him fixed. *Id*. Within five minutes of signing the waiver, Andrews was prescribed hydrocodone, Gabapentin, and other drugs. *Id*. A few days later, appointments were made at the Pain and Spine Clinic at the University of Arkansas for

Medical Sciences ("UAMS"). *Id*. "[R]ecords requests to include appointments were made within minutes" of Andrews signing the waiver. *Id*.

On April 1, 2019, Andrews was sent to UAMS and saw non-Defendant Dr. Howard. (Doc. 2 at 14). Dr. Howard told Andrews that a vertebra was crushing into the vertebra below it, and there were bone fractures. *Id*. Dr. Howard planned to have an MRI done and to do a procedure that could possibly prevent further crushing of Andrews's vertebra, help with the pain, and fix many of Andrews's major back problems. *Id*. Andrews was also told that he had osteoarthritis and osteoporosis. *Id*. Dr. Howard recommended medications, requested an MRI, and asked that Andrews return to the Pain and Spine Clinic in a timely manner. *Id*.

On October 10, 2019, Andrews was taken back to the Pain and Spine Clinic after having an MRI at the hospital in early June 2019. (Doc. 2 at 14). The transportation officers arrived at the clinic with another inmate's medical records inside Andrews's medical file. *Id*. The doctor stated that, even though all the medical information did not belong to Andrews, it did not matter because too much time had passed since Andrews's last visit. *Id*. The doctor said that "Medical" was supposed to have Andrews back quickly, not six months later. *Id*. He stated that the procedure could no longer be performed, and the only available option was medication and spinal injections. *Id*. Andrews's hydrocodone dosage was increased to three times a day, and he would be scheduled for spinal injections. *Id*. at 15.

That day, Andrews wrote a grievance about the six-month delay in bringing him back to the Pain and Spine Clinic, which hindered the possibility of the medical

procedure. (Doc. 2 at 15). He also complained that the transportation officers brought the wrong medical records to his appointment. *Id*. The next day, Earl, Warden at Ouachita River Unit, retaliated against Andrews and had him transferred immediately to ADC's Grimes Unit. *Id*.

On October 11, 2019, Andrews arrived at the Grimes Unit with medications that were packed by a nurse at the Ouachita River Unit in front of Andrews, given to transport officers, and delivered to Grimes Unit staff. (Doc. 2 at 15). At the first pill call at the Grimes Unit, the computer showed all the medications had arrived, except the nurses could not find Andrews' pain medication, the hydrocodone. *Id*. Nurses said that the hydrocodone must not have been received. *Id*.

The next day, Andrews asked about his pain medication. (Doc. 2 at 15). For a week, the nurses told Andrews, "you will not get that here[.]". *Id*. On October 19, 2019, a female doctor was called into the prison and wrote a prescription for hydrocodone after reviewing Andrews's medical records. *Id*.

On November 18, 2019, Andrews's hydrocodone ran out and was supposed to have been re-ordered two or three days earlier, but the medication had not been sent. (Doc. 2 at 16). Andrews filed a grievance. *Id*. He was called to the infirmary and told he would not get any more hydrocodone. *Id*. Andrews claims that numerous professionals prescribed hydrocodone, it had been approved along with the spinal injections, and then an unidentified nurse stopped it against the specialists' orders. *Id*.

On November 20, 2019, Andrews was taken to UAMS for more spinal injections. (Doc. 2 at 16). The clinic wanted to know why he had been taken off hydrocodone. *Id*.

Andrews had no answer, and the spinal injections were beneficial. *Id*. On December 6, 2019, Andrews was again taken to UAMS for spinal injections. *Id*. They proceeded with successful spinal injections. *Id*.

On an unspecified date, Andrews submitted a sick call due to some swelling and pain from injections and chronic back pain. (Doc. 2 at 16). He was charged for the medical visit in retaliation for filing a grievance. *Id*. Andrews has been repeatedly charged for medical visits for chronic conditions since filing a grievance. *Id*.

On an unspecified date, Ramsey, a Grimes Unit classification officer, retaliated against Andrews by consistently placing him in a class 4 barracks.[3] (Doc. 2 at 17). Andrews asserts that placing him in a class 4 barracks with inmates who cause more trouble than inmates in a class 1, 2, or 3 barracks put him at a substantial risk of harm from problematic inmates. *Id*. Andrews requested to be placed in a smaller barracks with older inmates or inmates with disabilities. *Id*. He was concerned that being placed in a larger barracks with more inmates placed him at a greater risk of contracting COVID-19 and an increased risk to his safety. *Id*.

On April 5, 2020, Dr. Foster evaluated Andrews's back and decided to change the course of treatment. (Doc. 2 at 17). Dr. Foster "discounted" an orthopedic pain management specialist with spinal injections and nerve fusions, and he said that pain was good. *Id*. Dr. Lemon, a physical therapist, stated that physical therapy was complete, and now it was up to a pain management and specialists at UAMS. *Id*. Dr. Foster prescribed

---

[3] Andrews attached to his Complaint an inmate request form, dated March 16, 2020, wherein he requests to be housed in a class 1 barracks. (Doc. 2 at 62). Although he does not provide the date that Ramsey allegedly placed him in a class 4 barracks, it appears to have occurred prior to March 16, 2020.

11

high doses of calcium and vitamin D3 to help with Andrews's osteoarthritis and osteoporosis. *Id*.

"Two years later," on an unspecified date, Andrews had an infected tooth. (Doc. 2 at 17). A dentist at the Grimes Unit reviewed his medical history and asked what type of cancer Andrews was being treated for. *Id*. Andrews told the dentist that he was not aware of any cancer, and the dentist said that "alendronate sodium calcium scrum" is used to treat cancer. *Id*. at 17–18. The dentist prescribed an antibiotic and other medications for six weeks, then extracted the tooth, and prescribed antibiotics and other medications for another four weeks to prevent osteonecrosis of the jawbone. *Id*. at 18.

On an unspecified date, Andrews's orthopedic shoes, leg brace, back belts, and walker with wheels were all taken away as a form of retaliation. (Doc. 2 at 18). On an unspecified date, Billy Cowell, Director of Medical Services at the Grimes Unit, administered the COVID-19 vaccine to Andrews, but Andrews did not receive any booster vaccines or masks. (Doc. 2 at 18). His pleas for booster vaccines and masks were ignored. *Id*.

On an unspecified date, Andrews saw Dr. Beck, who told Andrews that he was very limited in what he could prescribe. (Doc. 2 at 18). Dr. Beck read Andrews's medical records and said his osteoporosis was so bad that a neurologist could not help. *Id*. Andrews asserts that, after two years of waiting to see a neurologist, his appointment was canceled. *Id*. However, Dr. Beck said that he would prescribe Gabapentin and Baclofen and try to get Andrews back on some type of pain management. *Id*. at 18–19.

On an unspecified date, Dr. Smith took over for Dr. Beck. (Doc. 2 at 19). Dr. Smith told Andrews that Gabapentin and Baclofen were "now banned" and simply said that some people are broken and cannot be fixed. *Id*. Dr. Smith put Andrews on Keppra and left him in pain with no help. *Id*.

Andrews asserts that he does not have a spleen or an appendix, and his "factor 5 blood clotting disorder" is problematic with vaccinations due to the serious blood clot risk. (Doc. 2 at 18). He suffers from chronic obstructive pulmonary disease, asthma, Hepatitis C, and he has had pneumonia with sepsis multiple times. *Id*. Andrews also suffers from an immuno-compromised system. *Id*.

Andrews seeks declaratory relief, injunctive relief, and monetary damages. (Doc. 2 at 23).

**III.   DISCUSSION**

To survive pre-service screening under the PLRA, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]abels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertions devoid of further factual enhancement" are insufficient to plead a plausible claim. *Id.* And, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

However, "[a] pro se complaint must be liberally construed," and courts "should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d

843, 849 (8th Cir. 2014) (cleaned up; citations omitted); *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (citation omitted). Liberally construing Andrews's Complaint, he fails to allege any plausible claim against any of the named Defendants. Accordingly, for the reasons stated herein, the Court recommends that Andrews's claims be dismissed without prejudice.

### A. Wellpath/Corrective Care Solutions

Andrews names Wellpath and Corrective Care Solutions as Defendants to this action. (Doc. 2 at 19). It is well settled that a corporation, such as WellPath or Corrective Care Solutions, cannot be held liable for the wrongful conduct of its employees in a § 1983 action. *Burke v. N. Dakota Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002). To support a claim against Wellpath or Corrective Care Solutions, Andrews must show that there was a policy, custom, or official action that inflicted an actionable injury. *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006); *Sanders v. Sears Roebuck & Co.*, 984 F.2d 972, 975–976 (8th Cir. 1993). Andrews has failed to allege that Wellpath or Corrective Care Solutions had any unconstitutional policy, custom, or practice that violated his right to constitutionally adequate medical care and caused him harm. Accordingly, Andrews has failed to state a constitutional claim for relief against WellPath or Corrective Care Solutions.

### B. No Personal Action

Andrews sues Defendants Dr. Vol and Armstrong in their individual and official capacities, and he sues Defendants Payne, Musselwhite, Jackson, Page, and Hurst in their official capacities. (Doc. 2 at 19–20). In § 1983 actions, government officials are only

14

liable for their "own individual actions." *Iqbal*, 556 U.S. at 676 (emphasis added). Andrews does not mention Dr. Vol, Armstrong, Payne, Musselwhite, Jackson, Page, or Hurst in his factual allegations. Without any facts regarding actions taken directly by these seven Defendants, the Court is unable to determine if any of these Defendants violated Andrews's constitutional rights. As presented, Andrews has failed to state a plausible claim against Defendants Dr. Vol, Armstrong, Payne, Musselwhite, Jackson, Page, or Hurst.

### C.      Statute of Limitations

The majority of Andrews's allegations occurred between April 20, 2017, and April 5, 2020. (Doc. 2 at 5–17). Andrews initiated this § 1983 action on May 23, 2024. (Doc. 2). When it is clear from the face of the Complaint that a claim falls outside of the applicable limitations period, the Court may properly dismiss that claim at the screening stage. *Jones v. Bock*, 549 U.S. 199, 215 (2007) (explaining that a complaint can be dismissed for failure to state a claim when it is apparent, from the face of the complaint, that the statute of limitations has run); *Winston v. Burl*, 596 Fed. App'x. 525, 525 (8th Cir. 2015) (affirming § 1915A dismissal of claims that were barred by the statute of limitations). The statute-of-limitations period for § 1983 actions filed in Arkansas is three years. *Spradling v. Hastings*, 912 F.3d 1114, 1119 (8th Cir. 2019); *Miller v. Norris*, 247 F.3d 736, 739 (8th Cir. 2001).

Because Andrews filed his Complaint on May 23, 2024, any allegations of unlawful conduct that occurred before May 23, 2021, are barred by the statute of limitations and should be dismissed for failure to state a claim. Accordingly, it is

15

recommended that the following Defendants be terminated as parties to this action, as the only allegations against them occurred prior to May 23, 2024: Wendy Kelley, Griffith, Faust, Earl, Dr. Daniels, Dr. Foster, Dr. Lemon, Jason Kelley, Pierce, Smarjessee, Delaney, and Ramsey.

### D. Dateless Inadequate-Medical-Care Claims

Andrews does not provide exact dates for the only alleged constitutional violations that are not clearly barred by the statute of limitations. (Doc. 2 at 17–19). He states that he was evaluated by Dr. Foster on April 5, 2020, and, on an unspecified date "[t]wo years later," he had an infected tooth. *Id*. at 17. He claims that his orthopedic shoes, leg brace, back belts, and walker with wheels were all taken away as a form of retaliation on an unspecified date. *Id*. at 18. Andrews fails to provide dates or to name any individuals associated with these allegations. *Id*.

Andrews's dateless claims against Cowell, Dr. Beck, and Dr. Smith can be construed as allegations of inadequate medical care. (Doc. 2 at 18–19). To plead a plausible inadequate-medical-care claim under the Eighth Amendment, there must be facts suggesting: (1) Andrews had an objectively serious need for medical care; and (2) Defendants subjectively knew of, but deliberately disregarded, that serious medical need. *See Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021); *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018). As to the second element, deliberate indifference is a high threshold that goes well beyond negligence or gross negligence. *Hall v. Higgins*, 77 F.4th 1171, 1179 (8th Cir. 2023); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). To establish deliberate indifference, there must be facts suggesting Defendants "recognized that a

substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Shipp*, 9 F.4th at 703 (emphasis in the original); *Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). A mere disagreement with the course of medical care does not rise to the level of a constitutional violation. *Langford*, 614 F.3d at 460; *Barr*, 909 F.3d at 921–22.

Andrews provides no factual allegations against Cowell beyond stating that Cowell administered the COVID-19 vaccine to Andrews.[4] (Doc. 2 at 18). This bare assertion is insufficient to state a claim against Cowell. *Iqbal*, 556 U.S. at 678. While Andrews claims that his pleas for booster vaccines and masks were ignored, he fails to provide any facts about when his requests were made and to whom. (Doc. 2 at 18).

Andrews claims that, on an unspecified date, Dr. Beck told Andrews that he was very limited in what he could prescribe. (Doc. 2 at 18). After reviewing Andrews's medical records, Dr. Beck said his osteoporosis was so bad that a neurologist could not help, and the appointment he had anticipated for two years was canceled. *Id*. However, Andrews does not plead that Dr. Beck personally denied him medical care. Rather, Andrews acknowledges that Dr. Beck said he would prescribe Gabapentin and Baclofen and try to get Andrews back on some type of pain management. *Id*. at 18–19. Thus, Andrews has failed to show that Dr. Beck was deliberately indifferent to his serious medical needs.

---

[4] Andrews attached to his Complaint an inmate grievance form, dated September 10, 2021, wherein he asserted that he did not receive the incentive fee for getting the COVID-19 vaccine that was administered by Cowell. (Doc. 2 at 191). He does not provide the date that he received the vaccine.

Finally, Andrews asserts that, on an unspecified date, Dr. Smith took over for Dr. Beck and said that Gabapentin and Baclofen were now banned. (Doc. 2 at 19). He prescribed Keppra for Andrews and left him "in pain with no help." *Id*. Despite Dr. Smith's comment that some people are broken and cannot be fixed, Andrews does not plead that Dr. Smith personally denied him medical care. *Id*. Rather, Dr. Smith prescribed Keppra for Andrews because his prior medications were "banned." *Id*. Based on a reading of Andrews's exhibits, it appears that his claim against Dr. Smith is not barred by the statute of limitations. (Doc. 2 at 68, 186). However, even liberally construed, these allegations do not show that Dr. Smith was deliberately indifferent to Andrews's serious medical needs.

Even if Andrews's undated allegations occurred after May 23, 2021, and are not barred by the statute of limitations, he has failed to establish that Cowell, Dr. Beck, or Dr. Smith were deliberately indifferent to his serious medical needs. Accordingly, Andrews has failed to state a deliberate-indifference claim against any Defendants.

### E.      Official-Capacity Claims

Andrews also sues Cowell, Dr. Beck, and Dr. Smith in their official capacities. (Doc. 2 at 20). To plead a claim against these Defendants in their official capacities, if they are ADC employees, Andrews must allege facts showing that the purported constitutional violations were the result of an official ADC policy, an unofficial custom, or a failure to train. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). However, if these Defendants are Wellpath employees, Andrews's official-capacity claims against them are the equivalent of claims against their employer,

Wellpath. *See Sanders,* 984 F.2d at 975–76. To succeed on a claim against Wellpath, Andrews would have had to plead that a Wellpath policy or custom was the driving force behind the violation of his rights. *Id*. Even liberally construing his Complaint, Andrews makes no such allegations; therefore, he has failed to state an official-capacity claim against any of the named Defendants.

## IV.   CONCLUSION

After careful consideration of Andrews's Complaint, (Doc. 2), the Court finds that Andrews fails to state a claim upon which relief may be granted.

IT IS THEREFORE RECOMMENDED THAT:

1. Andrews's Complaint, (Doc. 2), be DISMISSED without prejudice.

2. The Court RECOMMEND that the dismissal count as a "strike" for the purposes of the Prison Litigation Reform Act. 28 U.S.C. § 1915(g).

3. The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommendation and the accompanying judgment would not be taken in good faith.

DATED this 10th day of December, 2024.

_____
UNITED STATES MAGISTRATE JUDGE